■ In the Matter of TAMARA G., a Child Alleged to be Abused. MURRAY G., Appellant; ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. [745 NYS2d 6] —Orders, Family Court, New York County (Susan Larabee, J.), entered on or about January 3, 2000, as amended February 28, 2000 (fact-finding), and June 27, 2000 (disposition), in this Family Court Act article 10 proceeding, finding that the respondent-appellant had sexually abused his daughter, and releasing the child to the nonparty mother, denying the respondent any contact with her "until such time as the child and her therapist deemed it advisable," unanimously reversed, on the law and the facts, without costs, and the matter remitted to a different judge for proceedings not inconsistent with this Court's decision, including new fact-finding and dispositional hearings.

Respondent Murray G. and his wife Alice G. divorced in 1990. Alice was granted custody of their only child, Tamara G., born

on June 16, 1986. Respondent had visitation rights three out of every four weekends, and the child spent half of the summer and certain holidays with him. This proceeding concerns allegations, first raised in 1997, that respondent had sexually abused his daughter.

At the fact-finding hearing, the presentment agency introduced testimony from Tamara's private psychologist, Dr. Mel Schneiderman; a case worker from the Administration for Children's Services (ACS), Charlie Banks; and an expert in pediatrics and child sexual abuse, Dr. Margaret McHugh. The agency also presented various hospital records.

Dr. Schneiderman testified that Alice G. took then 11-year-old Tamara to see him on November 18, 1997, following complaints, repeated by Tamara in the session, that she no longer wanted to visit her father because he ignored her and refused to help her with her homework. On November 23, 1997, Alice G. telephoned Dr. Schneiderman and told him that Tamara had told her that respondent had exposed himself to her and that she had seen him masturbating. At her therapy session two days later, Tamara told the doctor that her mother's account was true, but refused to repeat the details. On December 9, 1997, Tamara told Dr. Schneiderman that her father would put his hands in his pockets and play with himself for "hours at a time"; that on a few occasions he had pulled down his pants and played with his "private parts" for "hours and hours"; and that he "writes with a pen on his private parts" and has been doing so "since she was five years old." Dr. Schneiderman reported the allegations to ACS.

On December 14, 1997, Alice G. called Dr. Schneiderman and told him that Tamara said that her father had raped her both anally and vaginally during her visit with him during the weekend of November 8, 1997. Tamara was taken to St. Luke's-Roosevelt Hospital for examination. The hospital records reported a normal rectal examination. However, the report of the vaginal examination stated, as relevant, the "hymen is not intact, copious discharge, erythema around introitus, no hematoma or ecchymosis." A second report of abuse was made to ACS, respondent's visitation was cut off, and the presentment agency filed its original petition, which alleged, inter alia, that respondent had raped his daughter.

Dr. Schneiderman testified that on December 17, 1997, Alice G. told him that Tamara was refusing to go to school and was terrified that respondent would kill her. At his sessions with Tamara on December 23, 1997 and January 13, 1998, she refused to talk about the abuse. On January 15, Alice G. told

Dr. Schneiderman that Tamara was expressing a desire to kill herself. Dr. Schneiderman told Alice G. to take Tamara to St. Vincent's Hospital. Tamara was hospitalized for approximately two months and placed on Zoloft. When Dr. Schneiderman saw Tamara on March 3, 1998, after her release from St. Vincent's Hospital, he found her "very guarded" yet, at the same time, "provocative," attempting to sit on his lap. During this session, Tamara stated that she was no longer suicidal but was very angry with her mother. She said she was also afraid the respondent would try to kill her. Dr. Schneiderman diagnosed Tamara as suffering from posttraumatic stress disorder (PTSD) stemming from the alleged abuse. However, Dr. Schneiderman also opined that some of Tamara's more outrageous allegations might be fantastical, which, he stated, was not uncommon in a case of child sexual abuse.

Charlie Banks, the caseworker for ACS, testified that she interviewed Tamara and her mother on December 12, 1997, the day after the agency received an initial report of abuse; this report did not allege rape. Alice G. told Ms. Banks that she had been pleased to have Tamara visit respondent because she wanted Tamara to have a relationship with her father, and it gave her time for herself. When questioned by Banks about the allegations, Tamara reluctantly admitted that her father had masturbated in front of her, but denied that he had ever rubbed up against her or touched her inappropriately. She said that she had not immediately told her mother because she was afraid that respondent would kill her.

On April 13, 1998, after learning about the alleged rape, Banks re-interviewed Tamara. In an apparent misunderstanding about the date of the rape, Banks asked Tamara whether she remembered what had happened on June 28, 1997. Tamara told her that respondent had raped her for the first time that day. According to Banks, Tamara told her that respondent called her into his bedroom in the morning, and that he had raped her both vaginally and anally. Again, Tamara stated that she did not report the rape to her mother because she feared respondent would harm them.

Dr. McHugh, an associate professor of pediatrics at New York University, next testified for the agency as an expert in child sexual abuse. Dr. McHugh worked in a clinic at Bellevue Hospital which examined children for suspected sexual abuse. A few days after being discharged from South Oaks Hospital

on April 3, 1998,[1] Tamara was admitted to Bellevue following complaints from her mother that Tamara had assaulted her. At the time of Tamara's admission, Alice G. had a black eye and a number of bruises. During her hospitalization at Bellevue, Tamara was reported as having visual hallucinations, suicidal ideation, and homicidal ideation towards respondent. She was assessed as suffering from PTSD with psychotic features, and diagnosed with a moderate to severe major depressive disorder. On April 17, 1998, Dr. McHugh performed a genital examination of Tamara, at the request of her treating psychiatrist. Dr. McHugh found thinning of the "posterior fourchette" and "hyperpigmentation" and a "hemorrhoidal mass" in the "perineal area," conclusively indicating sexual abuse "consistent with manipulation of the area." Contrary to the St. Luke's Emergency Room report, Dr. McHugh found that Tamara's hymen was intact and that there was no physical evidence of either vaginal or anal penetration.

At the close of the agency's case, respondent moved for Tamara to be produced, either in camera, or before the court, and to dismiss the petition. Petitioner opposed, and made a cross motion to conform the pleadings to the proof. The court denied respondent's motion in its entirety. However, it granted petitioner's cross motion to conform the pleadings to the proof. On October 25, 1999, petitioner filed an amended petition which tracked the testimony of Dr. Schneiderman. The original rape allegations were replaced by allegations consistent with Dr. McHugh's examination, that respondent had repeatedly touched and rubbed up against his daughter in a sexual manner. Respondent, then a 57-year-old university computer science teacher, testified in his defense and categorically denied abusing his daughter. He testified that he has a warm relationship with Tamara and actively participated in her development. He characterized his divorce from Alice G. as very acrimonious, with his wife having initiated most of the disputes. During the past seven years he had used all the visitation allowed to him, but Alice G. constantly interfered with his time with Tamara.

In addition to his own testimony, respondent presented the testimony of Dr. Robert Goldstein, an expert in child and adolescent psychiatry, and Dr. Leonard Wolf, a clinical professor at NYU School of Medicine with a specialty in obstetrics and gynecology. Respondent also presented an audiotape and

---

1. Tamara was admitted to South Oaks Hospital after her mother complained that she was exhibiting suicidal ideation and violent behavior including pounding walls and punching her.

transcript of a telephone message left on his answering machine in July 1998 in which Tamara is crying hysterically and apologizing for lying about the sexual abuse.[2]

Dr. Goldstein testified that he had been in private practice since 1969 and had treated child victims of abuse. Most of his testimony addressed the fact that respondent did not fit the profile of a pedophile. In addition, Dr. Goldstein testified that after reviewing Tamara's hospital records, he believed that many of Tamara's allegations lacked credibility. Dr. Goldstein testified that he believed that the signs and symptoms that Tamara was exhibiting, which he labeled as insomnia, anxiety and thought disorder, were not necessarily indicative of PTSD. He opined that Tamara may either be suffering from the first stages of schizophrenia, which was consistent with the impaired reality testing, loosening of associations and visual hallucinations, or that she was an emotionally vulnerable child who was reacting to manipulation by her mother and the general friction between her parents. Her symptoms, he opined, may not have been caused by abuse. Finally, Dr. Goldstein opined that Tamara's telephone recantation was reliable because Tamara had not been under the control and influence of respondent when she made the statements. This expert admitted that his findings were limited by the fact that he had not actually interviewed Tamara or her mother.

During Dr. Goldstein's direct testimony, respondent made a second motion, renewed before the testimony of respondent's next expert, for the court to order Tamara to be produced as a witness, for the court to examine her in camera, or, alternatively, that an independent psychiatrist be appointed by the court to examine the child and her parents. The court denied all aspects of the request.

Dr. Wolf, an expert in vulvar diseases, next testified for the respondent that Tamara's recorded symptoms were not necessarily indicative of abuse. He opined that there might be a number of innocuous explanations for Dr. McHugh's findings. However, this doctor had not personally examined Tamara. He reached his conclusions from review of the records from St. Luke's Hospital and from a conversation with Dr. McHugh.

The Family Court rendered a fact-finding decision on February 28, 2000. It granted the petition, finding that respondent's testimony was not "candid and credible, was evasive and self-

---

**2.** On rebuttal, Dr. Schneiderman testified for the agency that in some 20% of abuse cases, the child recants. The recantation can be either true or false. False recantations can be precipitated by guilt feelings and a concern about the way the allegations have disrupted the family.

serving, and was not in any regard credible." The court rejected respondent's expert testimony, finding Dr. Goldstein's "unpersuasive" and Dr. Wolf's "particularly weak when contrasted with that of * * * Dr. McHugh." In contrast, the court found all of petitioner's witnesses credible, and found Tamara's out-of-court statements to be "amply and fully corroborated by the medical and psychological evidence." The court did not find the message recanting the abuse to be persuasive evidence that it did not occur. The court did not mention Alice G.'s failure to testify.

At the dispositional hearing, the agency presented a mental health study prepared by Family Court Mental Health Services in which the interviewer, William Scholler PhD, stated that he had interviewed respondent, who continued to deny the abuse. Scholler found respondent to have no evidence of "psychotic process" but to be "vague and self-serving." Based on reports of Tamara's PTSD, Scholler did not recommend visitation. In addition, the Agency presented an investigation and report (I&R) prepared by ACS as a follow-up to the fact-finding, which stated that Tamara had had "some rough times" as was to be expected with PTSD; was attending school and doing well; was taking medication and attending counseling, including a treatment program for girls who were the victims of sexual abuse; and that her behavior at home had improved significantly. The I&R recommended that Tamara be discharged to her mother with no supervision by ACS and that a permanent order of protection be issued against respondent.

Respondent disagreed with the agency's recommended disposition. He again requested a full scale forensic examination of Tamara, himself, and Alice G., because he was convinced that Tamara had been manipulated by her mother.

The Family Court released Tamara to her mother's custody and rejected respondent's request for visitation, refusing him any contact with the child, "unless and until the child's therapist and the child deem it advisable." We reverse and remand for new fact-finding and dispositional hearings because the cumulative effect of a number of significant evidentiary errors permeated the entire proceeding, tainting the result. There was such a clear conflict between the various accounts that the court had an obligation to obtain as much information as could be made available to make a reliable decision, without exposing the child to undue harm.

The experts provided conflicting opinions about the reliability of the child's allegations, and the results of the two physical examinations of the child were inconsistent. Further, the

amended petition alleged acts which, although explaining the results of the physical examination of one of the agency's experts, were never specifically alleged by the child (*see, Matter of Danielle G.*, 174 AD2d 666).

Respondent made three applications for Tamara to be produced at the hearing, or that the court examine her in camera. Respondent also requested that she be examined by an independent forensic expert. It was an abuse of the trial court's discretion to have summarily denied all aspects of respondent's requests (*Matter of Jamie EE.*, 249 AD2d 603; *Matter of Leslie C.*, 224 AD2d 947; *see also, Matter of Christa H.*, 267 AD2d 586). While there is no absolute right to have the alleged victim of abuse testify in an article 10 proceeding, here, a balancing of the respective interests weighs in favor of amplifying the present record to clarify numerous, unexplained inconsistencies. The Family Court abused its discretion here in summarily refusing to have Tamara examined at the hearing, either in camera, or if deemed appropriate, in open court (*Matter of Christina F.*, 74 NY2d 532, 535). On remand, we also direct the court to appoint an independent forensic expert to examine and perform a full evaluation of Tamara, and, if deemed advisable, either or both parents. The examination should include, but not be limited to, Tamara's general mental condition, the veracity of the allegations, the nature of her mental illness, and the impact on her of testifying at a new hearing or in camera. We further direct that Tamara G.'s mother, Alice G., be called to testify, subject to cross-examination, noting that her failure to do so would allow a court to draw the strongest negative inference about her influence on the child's allegations.

Moreover, testimony from an independent expert, who could not only have examined Tamara, but also could have advised the court as to the impact of in camera or trial examination, would provide the requisite measure of reliability for determining: whether parts of Tamara's original allegations were fantasy; whether or not her recantation was the product of sincere remorse at lying, or, as petitioner claims, mere desire to maintain the family structure (*Matter of Zachariah VV.*, 262 AD2d 719, *lv denied* 94 NY2d 756). An independent forensic analysis is also necessary to determine whether Tamara suffered from PTSD or whether her allegations of sexual abuse were the product of nascent schizophrenia (*see, Matter of Linda K.*, 132 AD2d 149, *lv denied* 70 NY2d 616).

Review of the dispositional order is rendered academic in light of our determination that the fact-finding order be

reversed. However, it bears noting that the power to determine visitation cannot be divested from the court to the child's therapist (*see, Matter of Sullivan County Dept. of Social Servs. v Richard C.*, 260 AD2d 680, 683, *lv dismissed* 93 NY2d 958). Concur—Mazzarelli, J.P., Saxe, Sullivan, Wallach and Lerner, JJ.

