■ In the Matter of FATIMA M. and Others, Children Alleged to be Abused and/or Neglected. RASHAD M., Appellant, ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent, et al., Respondent. [793 NYS2d 329]—

Orders, Family Court, New York County (Rhoda J. Cohen, J.), entered on or about December 6, 2002, which, inter alia, found two of the children abused and all five children neglected, unanimously reversed, on the law and the facts, without costs, and the matter remitted for a new fact-finding hearing.

Respondents Rashad M. and Bernadine M. are married and have three daughters and two sons.[1] In 2000, the Administration for Children's Services (ACS or the Agency) received information that the M. parents were using drugs, and began an investigation of the home. After Mr. M.'s toxicology report came back positive for cocaine, he was referred to a drug treatment program. The Agency continued to conduct biweekly home visits, and for a period of time it appeared that there were no further problems. However, in April 2001, one of the daughters, Aquellah, told an employee at her school that her father was touching her inappropriately.

---

**1.** The five children include Fatima M., born April 10, 1984; Aquellah M., born September 25, 1986; Taheerah M., born September 25, 1986; Furquan M., born May 10, 1988; and Anwar M., born August 21, 1989. Aquellah and Taheerah are identical twins.

As a result, on April 27, 2001, ACS filed a petition in Family Court alleging that the five children were abused or neglected under article 10 of the Family Court Act. The petition alleged that respondent father Rashad M. had sexually abused his daughter Aquellah for many years, and that respondent mother Bernadine M. knew or should have known about the abuse, failed to protect the children and suffered from a mental illness[2] which prevented her from providing her children with adequate supervision. The children were removed from the home pending determination of the merits of these allegations. On April 27, 2001, the court ordered that all the attorneys be notified prior to any evaluation of the child Aquellah, and that all interviews be videotaped. A fact-finding hearing was conducted between September 10, 2001 and December 6, 2002.

Petitioner ACS's first witness was Elizabeth Hittenmark, Director of Health and Family Services for the Family Academy.[3] Hittenmark testified that in late January 2001 Aquellah came to school with bandages on her arm which covered cuts. She testified that when asked about the injuries, Aquellah told her that she had been cutting her wrist, that she was unhappy at home, and that the problems included her parents selling drugs from their apartment and getting high in the home. Hittenmark also said that in April 2001 Aquellah told her that her father had been touching her inappropriately since she was about 10 years old and that she wanted it to stop. She further testified that Aquellah said that her father was having sex with her, that he told her she was going to be a stand-in for her mother, and that she wanted to die because of the things that were going on in her home.

On cross-examination, Hittenmark told the court that Aquellah had accused a neighbor named Andre of raping her. She also testified that Aquellah had written a number of letters, and that in one of the letters the child described having sexual contact with a teenage boy named J.B.

Petitioner's next witness was Ashton Evans, a caseworker for ACS who testified that he spoke with Aquellah on January 30, 2001 because the child had brought a razor into school. He averred that Aquellah admitted cutting her wrist to try to kill herself, but she stated that she went "slightly over her wrist,"

---

**2.** Records submitted from the respondent mother's health care provider indicated that she has been diagnosed with schizophrenia, that she hears voices, and has had suicidal ideation. She takes antidepressant and antipsychotic medications.

**3.** Family Academy was the school that the twin daughters, Aquellah and Taheerah M., attended.

because "she knew if she did it any deeper she knew that she would hurt herself." He said that Aquellah acted out at school and that she sometimes cursed at Evans. Evans testified that on April 26, 2001, he made a visit to the home with a coworker and explained the allegations of sexual abuse to respondent father. Rashad M., he said, denied abusing Aquellah, asserted he didn't know who was saying these things, and that he couldn't believe that this was happening. Evans reported that he also spoke to respondents' eldest child Fatima M., who denied ever being touched inappropriately by her father. He also testified that he spoke to the two younger boys, who said that they had never seen anyone in the home touch anyone else in a sexual way. Evans said he explained to all of the children that they had to be removed from the home.

On cross-examination, Evans testified that the first time he went to respondents' home was in November 2000, because of allegations that the parents were selling and using drugs. He stated that since November of 2000, he made visits to the home every two weeks, that he had referred Rashad M. to a drug treatment program in January 2001, and that on his visits, it appeared that the parents were cooperative, that the house was clean, and that the children seemed well cared for and happy. His notes from a February 1, 2001 home visit indicated that the children were not fearful and that the only child who appeared troubled was Aquellah. Evans stated that on March 16, 2001, he interviewed the twins in the home, and that they both said they were happy there and had no complaints. He also testified that on March 16 Aquellah told him that the allegations she had made against her father were not true. He said that after the children were removed from their parents' home, they were placed with their maternal aunt but were subsequently removed because Aquellah alleged that her aunt's boyfriend had molested her. Evans also testified that Aquellah had been brought to various hospitals because she was having suicidal ideation.

Petitioner's next witness was Maria Castro, a social worker at the Family Academy, Aquellah's school. Castro worked with Aquellah M. from January 2001 to June 2001. Hittenmark had referred Aquellah to Castro because Aquellah was having behavioral problems, and the school felt she needed to talk to someone. Castro testified that she observed cuts on the child's wrists on two occasions and that Aquellah had been admitted to St. Vincent's Hospital in February 2001.

Castro also stated that Aquellah told her that a man named Andre had pulled her inside a building, had exposed himself to her, and had fondled her. Further, Castro related that on April

18, 2001, she went with Aquellah to a police station to try to identify Andre. She stated that Aquellah made the identification and that Andre was arrested. Castro testified that Aquellah told her that her father was very grateful for Castro's help and that he wanted to buy her flowers. Castro said that she had responded: "I told her that was not necessary. That I was just doing my job. That I was glad I could be there for her. Umm— and later on I said, you know, in the conversation, I said to her that I felt that somehow I was missing the boat but I felt that she was in a lot of pain and I wasn't able to help her because she was—I felt she still wanted to hurt herself. And I asked her was there anybody who is trying to hurt you or doing anything to you. And then I asked her—has your father ever done anything that made you feel uncomfortable?" She said that Aquellah then told her that her father had been touching her since she was 10 years old, and that he had been making her touch his private parts. Aquellah, Castro said, stated that her father had sexual intercourse with her one time when she was 11 years old. Castro said that when Aquellah asked her whether she, Castro, was going to tell anyone, she answered that she was required to do so, and Aquellah stated "umm—it's o.k. Ms. Maria. Umm—umm—I'm—I'm the strong one. He will stop. He won't do it again." After their session, Castro notified Hittenmark and Evans about the allegation of abuse. On cross-examination, Castro was asked whether she had determined that Rashad M. was abusing Aquellah before she asked the child the question. Castro admitted this was possible.

The petitioner's next witness was Dr. Louise Buck, a clinical psychologist employed by the Metropolitan Center for Mental Health. Dr. Buck was qualified as an expert in the field of psychology. She testified that she started treating Aquellah M. with psychotherapy on March 1, 2001, after the child's February 2001 psychiatric hospitalization.

Dr. Buck diagnosed Aquellah with post-traumatic stress disorder (PTSD) and chronic depression with psychosis, manifested as auditory hallucinations. Dr. Buck testified that the child fit all of the criteria for PTSD in the DSM IV:[4] persistent avoidance of stimuli associated with trauma, persistent symptoms of increased arousal, difficulty falling asleep, irritability or outbursts of anger, difficulty concentrating, hypervigilance, and exaggerated startle response. Buck testified that Aquellah told

---

4. The DSM (Diagnostic and Statistical Manual of Mental Disorders) is a compilation of psychiatric diagnoses used by psychiatrists and created by the American Psychiatric Association. It is revised periodically and provides details of the symptoms of recognized mental disorders.

her about an experience with a neighbor who had pulled her into the shadows and fondled her, and that her father had sexually abused her from ages 10 through 13. The child, Buck said, provided detailed accounts of incidents of molestation, but her statements were not clear about whether there had been sexual intercourse. Buck said the child told her that the final time that she had been abused was in about January 2001, after she took her mother's side in a family quarrel, making her father very angry. Later that night, he went to Aquellah's bedroom and approached her from behind. Aquellah told Buck that she did not know exactly what happened, but that it hurt terribly and there was a lot of blood.

Dr. Buck testified that while the child suffered from auditory hallucinations, she did not consider Aquellah's statements or descriptions of the episodes of abuse to be fantasy. She also stated that the child had expressed guilt about the abuse. Further, Dr. Buck testified about Aquellah having set fires. She stated that a 1984 study indicated that only 14% of children who set fires were girls, but that 40% of those young girls who were setting fires were being sexually abused by either their father, an uncle or a brother. When cross-examined by respondent father's counsel about the fact that Aquellah recanted the allegations of abuse to authorities, Buck testified that this behavior was "quite usual," explained by the fact that the child did not want her father to go to jail.

Petitioner then called Detective Geselle Ortiz, a police officer who has investigated a criminal complaint against respondent. Ortiz stated that she interviewed Aquellah three times, that the child described incidents of abuse by her father, which started when the child was about 11 years old. Detective Ortiz said Aquellah told her that her father stopped abusing her after she started to hurt herself and was hospitalized for psychiatric problems. No criminal proceedings were brought against Rashad M. After Detective Ortiz's testimony, petitioner rested its case.

Throughout the presentation of its witnesses, petitioner introduced a number of exhibits, including records indicating that Aquellah had a number of hospitalizations for psychiatric problems. The records indicated that the child was brought to Harlem Hospital by her father in December 2000 after having allegedly been sexually abused by a stranger. She was subsequently treated at New York Presbyterian Hospital, St. Vincent's Hospital, and St. Luke's Hospital, on different dates for suicidal ideation. In February 2001, a doctor at St. Vincent's diagnosed her with adjustment disorder, mood disorder, and depression. Aquellah was also examined at Bellevue Hospital for

a psychiatric evaluation prior to being removed from her home; she was diagnosed with adjustment disorder with depressed mood. Although it is unclear from the record what types of examinations were performed at the various hospitals, none of the hospital reports contains any documentation of physical findings consistent with sexual abuse.

Aquellah and Taheerah's law guardian's first witness was Lisa Lubell, the director of the Child Sexual Abuse Education and Evaluation Treatment Project at Lawyers for Children. After eliciting Lubell's background and credentials, and hearing oral argument, the Family Court qualified Lubell as an expert in child sexual abuse.

Lubell testified that she had the opportunity to speak with Aquellah on numerous occasions, and that she also spoke with Aquellah's school therapist, her special education teacher, her treating psychologist, her ACS caseworker, agency social workers and her sister Taheerah. Lubell also reviewed the records of Aquellah's hospitalizations.

Lubell testified that in a July 2001 interview, Aquellah told her that she had been sexually abused by her father since she was approximately 11 years old, but that the child did not indicate whether the abuse involved penetration. Lubell stated that there are recognized symptoms of child sexual abuse. These include: self-mutilation, dissociative defenses, depression, problems in relating to peers and adults, trust issues, ambivalent family relations, recanting, accusing other people of touching them, and acting out. She opined that Aquellah's behavior was consistent with sexual abuse: suicidal thoughts, self-mutilation, extreme depression, not wanting to go home to her parents, being afraid of her father, disassociation (wanting to float away), acting out (setting fires), and allegations of sexual abuse against people other than her father. Lubell noted that, in the child's writings, Aquellah first talked about the abuse of a friend and then progressed to saying that she had been abused herself. Lubell explained that this type of progression is typical, given the difficulty of discussing incest.

Lubell said that incestuous families tend to be insular, and she noted that the M. family fit this description. Lubell also testified that the scenario of a disabled mother and a father saying that the abused daughter was like her mother was "classic incest." Lubell also opined that Aquellah showed symptoms of post-traumatic stress disorder, which was common in children suffering from sexual abuse. She stated that every time she spoke with Aquellah the child was consistent in her description of the abuse.

Further, Lubell testified that in August 2001 Taheerah told her that, starting when she was 11 or 12, her father sexually abused her. Lubell recounted that Taheerah also had strong symptoms of dissociation, depression and suicidal thoughts and that Taheerah told her that her father said she looked like her mother and would provide for him what her mother did not. Lubell said Taheerah told her that the last time her father sexually abused her was on Valentine's Day in 2001.

On cross-examination, respondent mother's attorney suggested that Taheerah may have made up her story of sexual abuse to get attention, but Lubell stated Taheerah's disclosures were "extremely believable." Lubell asserted that she was convinced by Taheerah's description of dissociative experiences which occur during abuse.

On February 25, 2002, respondent father made a motion for an expert of his choosing to examine both Aquellah and Taheerah. The court denied the motion, stating, "There is no evidence that there is any need for further evaluations for these children. There is no evidence that the experts provided by the petitioner who already evaluated the children did so and showed no bias, and subjecting the children to multiple examinations and evaluations is in and of itself, I think, potentially harmful to the children who are the subject of these proceedings . . . ." On July, 16, 2002, respondent father commenced his case. The parties agreed that Aquellah and Taheerah would testify in response to questions posed by the judge, that the respondent parents would not be in the courtroom during their testimony, but that counsel would be present. A list of proposed questions was provided by respondent father and reviewed by the court. The court also indicated that if clarification was necessary, it would pose additional questions. The court directed that upon completion of each child's testimony, the attorneys could indicate whether they wanted additional inquiry, and, if so, submit additional questions.

Aquellah began by describing her parents' home, including the cocaine use. She also related the progression of her father's molestation, and she told the judge that she was afraid of him. She testified that she had discussed what was happening with her sister Taheerah. However, Aquellah stated that she did not want to tell her brother Furquan because she did not want him or her other siblings to get upset at her for getting her parents into trouble. She said that she may have recanted her testimony to Mr. Evans and others because she did not want it to be true. Also, Aquellah said that after she had been removed from the home and was living with her aunt, the aunt's boyfriend Ishmael molested her.

Taheerah M. was examined next. She testified that she shared a room and bunk beds with Aquellah. Taheerah said that she slept on the top bunk, and sometimes she woke up at night and saw her father trying to lie next to Aquellah. Taheerah recounted that this occurred "a lot." Taheerah also told the court that her father had touched her inappropriately, and that she didn't say anything because she was afraid. Taheerah testified that she didn't see her aunt's boyfriend doing anything improper to her sister, and that he had not attempted anything improper with her. She admitted telling some people that her father hadn't abused her because her sister had also denied the abuse, and because "she didn't want to deal with the court."

Furquan M. was respondents' next witness, and he testified that he is 14 years old, that he never saw his parents doing drugs, and that he did not have any problems at home. He also stated that when Aquellah was in the hospital, she told him she had been lying about her father's drug use. Furquan said that he had not talked to Aquellah about the allegations that their father was touching her inappropriately.

Respondent father took the stand, and he adamantly denied the allegations of abuse of either Aquellah or Taheerah. He admitted that he had a problem with cocaine, but testified that he was complying with the requirements of a drug treatment program. The ACS caseworker had earlier testified that Rashad had not tested positive for any controlled substance since his January 2001 enrollment in the drug treatment program. Finally, respondent mother testified that neither of the twins had told her about any sex abuse or inappropriate behavior. She admitted using cocaine for seven years, and that she had suffered from depression. But, she repeatedly stated that she had taken care of her children. Respondents rested, and the fact-finding hearing was adjourned for summations.

On November 7, 2002, respondent father moved to reopen his case based upon a new allegation made by Aquellah that she had been molested by her father on a day that she left her group home and went to her parents' house to get asthma medication. The allegation was in the process of being investigated, and respondent alleged that a caseworker's testimony could decisively disprove this accusation of abuse. The court denied respondent's motion, because the investigation of the incident had not been completed.

After hearing summations, the court determined that Aquellah and Taheerah were credible witnesses. The court also gave great weight to the testimony of Dr. Buck, Aquellah's treating psychologist, who diagnosed the child as suffering from post

traumatic stress disorder with sexual abuse the primary cause. The court found that petitioner had proven, by a preponderance of the evidence, that the father had sexually abused his daughter Aquellah over a period of several years, and that Taheerah was in danger of similar abuse. The court also made a finding of neglect against both the mother and father as to all of the children. An order was entered placing the five children with ACS for 12 months. The court also issued an order of protection prohibiting all contact between respondent father and the children Aquellah and Taheerah.

Respondent father is appealing very serious findings that he sexually abused his twin daughters, Aquellah M. and Taheerah M., over a period of more than three years. Clearly, the outcome of this proceeding has enormous ramifications to this family. As petitioner did not present any physical evidence of abuse, an accurate assessment of the credibility of the witnesses was vital to determining whether the events took place as described. This case required that all methods available to enhance the reliability of the fact-finding process be utilized.

However, on the record before us, we are unsatisfied that the Family Court was sufficiently informed. The evidence shows that Aquellah had a history of psychiatric problems and hospitalizations for psychiatric treatment, and had displayed severe behavioral problems. Although petitioner's witnesses attributed all of the child's difficulties to a syndrome accompanying child sexual abuse, none of the witnesses ruled out the possibility that the child's psychiatric and behavioral problems might be unrelated to the alleged abuse. In fact, the child's psychiatric and behavioral problems may, themselves, have led the child to make false accusations of abuse against her father, and they may have increased her vulnerability to suggestion. At this point, it bears repeating that Aquellah's first allegation of her father's abuse came in response to a leading question by Maria Castro, a school social worker. Castro admitted on cross-examination that she suspected paternal abuse before she specifically asked Aquellah whether "[her] father [had] ever done anything that made [her] feel uncomfortable." The record is unclear as to whether other witnesses may also have sparked allegations of abuse through leading questions and suggestion.

Aquellah also recanted her accusations against her father on a number of occasions, and she made allegations of sexual abuse against a number of other individuals. These people included an unknown man, a neighbor named Andre, and her aunt's boyfriend Ishmael. While recantation is not uncommon in cases involving intrafamily sexual abuse (*see e.g. Matter of R./B. Chil-*

*dren*, 256 AD2d 96 [1998]; *Matter of N & G Children*, 176 AD2d 504, 505 [1991]), it puts the credibility of the accuser at issue. In addition, the fact that Aquellah made allegations that she had been abused by several different people also raises a question as to whether her allegations were truthful.

Further, the records from Aquellah's various hospitalizations show no physical findings consistent with sexual abuse. While the significance of this fact in disproving abuse is sometimes minimal (*see Matter of Dora F.*, 239 AD2d 228, 230 [1997], *lv denied* 92 NY2d 805 [1998] ["the absence of physical evidence does not preclude a finding of sexual abuse"]; *see e.g. Matter of Linda K.*, 132 AD2d 149 [1987], *lv denied* 70 NY2d 616 [1988]), in this case it is inconsistent with those of Aquellah's allegations which involved penetration and bleeding. One incident was described by the child as resulting in extensive bleeding. Thus, given the nature of the alleged abuse, this lack of any physical findings raises questions as to her veracity.

Moreover, while the court directed that all interviews of Aquellah be videotaped pursuant to Family Court Act § 1038 (c), this order was inexplicably and unjustifiably disregarded. The extant record provides no opportunity for independent review of those interviews, or any way to determine if they were tainted, as is often the case due to the innate suggestibility of children, and particularly, as here, where one of the subject children has a complex set of psychiatric problems. The court was left without a means of making any independent assessment of the methodology and fairness of the interviews, and respondent's counsel was deprived of an opportunity to cross-examine petitioner's witnesses on the issue of the manner in which the interviews were conducted. Given the failure to comply with the videotaping directive, the court had discretion "to refuse to consider any resulting opinion testimony . . . offered to prove that the child has been abused, or to corroborate the child's statements" (*Matter of Michael J.*, 211 AD2d 155, 157 [1995]). The court did not do this and fully accepted the opinion testimony offered by petitioner's and the law guardian's experts, who had based their conclusions, in large part, on these unreviewable interviews.

Another error which impacted the fundamental fairness of the proceeding was the court's denial of respondent father's request either to have his own expert or an independent expert conduct an examination of the twins pursuant to Family Court Act § 1038 (c). That statute provides that a respondent can move for an order directing that the child who is the subject of the proceeding be made available for examination, and it directs

that "[i]n determining the motion, the court shall consider the need of the respondent . . . for such examination to assist in the preparation of the case and the potential harm to the child from the examination." "The statute is designed to enhance procedural fairness and the fact-finding process, particularly in cases where the petitioner's proof will depend substantially on expert opinion" (*Matter of Jessica R.*, 78 NY2d 1031, 1033 [1991]). This is such a case.

While petitioner and the law guardian were allowed to present their own experts, who opined that the twin girls had been subject to sexual abuse by their father, respondent father himself was not allowed to have an expert. By not allowing respondent father to present an expert, he was effectively precluded from fully exploring the possibility that Aquellah's accusations were a manifestation of her psychiatric problems. As such, his ability to present a defense was severely curtailed. While we are not insensitive to the effect on the children here, there was no evidence that this additional interview would traumatize either child. By the conclusion of the fact-finding hearing, the twins were 16 years old and had been away from their parents for more than 18 months. Thus, it was an abuse of the court's discretion to have denied respondent's application to have his own expert examine the children, where there was a demonstrated need, and no evidence that the children would suffer any appreciable additional harm (*see Jessica R., supra*; *Matter of Tamara G.*, 295 AD2d 194, 200 [2002]).

While we ordinarily rely on the fact-finder's assessment of credibility and generally give it great deference, we are not bound to do so where, as here, the court failed to allow a full record to be developed, and to enforce directives which would have guarded the integrity of the record. The seriousness of the charges in this case, their effect on the parties, and the ramifications of the finding cannot be overstated. However, respondents were nevertheless entitled to due process and fundamental fairness, which they did not receive. There were a number of errors, the cumulative effect of which was to deprive respondents of the opportunity to present their defense. Accordingly, we reverse the order appealed and remand for a new fact-finding hearing. We have considered and rejected the parties' additional claims. Concur—Mazzarelli, J.P., Marlow, Ellerin, Gonzalez and Catterson, JJ.